Argued and submitted January 13, reversed; referee's order
reinstated July 21, reconsideration denied September 2,
petition for review denied September 21, 1982 (293 Or 521)

In the Matter of the Compensation of
Elmer W. Petz, Claimant.

PETZ,
*Petitioner,*

*v.*

BOISE CASCADE CORPORATION,
*Respondent.*

(WCB No. 79-01374, CA No. A21763)

648 P2d 372

Robert W. Muir, Albany, argued the cause for petitioner. With him on the brief was Emmons, Kyle, Kropp & Kryger, P.C., Albany.

Katherine H. O'Neil, Portland, argued the cause for respondent. With her on the brief were Paul R. Bocci, and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Before Richardson, Presiding Judge, and Thornton and Van Hoomissen, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

■    Claimant appeals an order of the Workers' Compensation Board that reversed a referee's opinion and order finding that he is permanently and totally disabled. Because claimant was determined to be permanently and totally disabled in 1975, the employer bears the burden of proving that he is no longer totally disabled. *Bentley v. SAIF,* 38 Or App 473, 478, 590 P2d 746 (1979). The issue is whether employer has sustained its burden of proof.

Claimant sustained an on-the-job injury to his back in 1969. A lumbar laminectomy was performed. He was declared medically stationary in 1970 and returned to work. In September, 1971, he reinjured his back, resulting in his hospitalization for traction. He has not been gainfully employed since.

In March, 1972, the Back Evaluation Clinic reported:

"Diagnoses:

1.   Status post-lumbar laminectomy.

2.   Probable herniated nucleus pulposus question L5-S1 left secondary to injuries sustained September 19, 1971, by history.

"Recommendations:

1.   The patient should be returned to his treating doctor to be considered for further investigation including myelography and surgery if indicated.

2.   Claim closure to be initiated after completion of treatment by treating physician at the request of the treating physician.

3.   The patient can be discharged from the Disability Prevention Division.

4.   The patient is unable to return to his former occupation; at present it can not be determined if a job change is indicated."

Dr. Tsai performed a second laminectomy in September, 1972. He reported that claimant "has been temporarily totally disabled from May 18, 1972 through approximately 4-6 months after [the second] surgery."

Dr. Seres examined claimant in March, 1974. He found him to "have a permanent disability with respect to his low back," which he rated "moderately severe." In August, Dr. Russakov said that "decreased mobility and endurance would substantiate the fact that this man is feeling real pain and I see him as totally disabled in terms of any work situation." Dr. Russakov's report was reviewed and "approved" by Dr. Seres. At the same time, Dr. Newman, a psychologist, observed that "taken together, emotionally, intellectually and physically, [claimant] appears to me to be significantly, if not totally, disabled."

Prior to April, 1975, claimant had been awarded a total of 75 percent unscheduled disability. In April, 1975, a referee concluded· that he was permanently and totally disabled. No appeal was taken from that order.

In 1978, at employer's request, claimant was examined by Dr. Specht, who also viewed movies of claimant working on his house. He said:

"It is evident to me and was evident before viewing the movie alluded [to], that [claimant] is not totally and permanently disabled. He is capable of vocational rehabilitation and in spite of his low degree of education, he has certain very marketable skills such as construction abilities. He is capable of performing work which does not involve excessive frequency of bending and stooping, or lifting over 35 pounds * * *."

Employer then wrote to the Evaluation Division enclosing Dr. Specht's report and advising that, to the best of its knowledge, claimant had not been under the care of a physician since 1974 and that he had apparently not been taking any medication, because no bills had been submitted to employer for payment. On the carrier's request for a redetermination, the Division recommended that claimant's award be modified to 80 percent unscheduled disability. In February, 1979, the Board, on its own motion, see ORS 656.278(1), reduced claimant's award to 80 percent unscheduled disability. After the Board issued its order, claimant tried without success to find employment.

Claimant appealed, ORS 656.278(3), and requested a hearing. ORS 656.283. The referee found that claimant's testimony about his disability was "not significantly

contradicted by the films" and that there was "no other evidence to question the claimant's credibility." The referee concluded that claimant is permanently and totally disabled and has been since 1975. On appeal, the Board concluded,

" * * * based on a preponderance of the evidence presented, that claimant is not permanently and totally disabled."

The Board thereupon reinstated the award of 80 percent unscheduled disability. One Board member dissented. We review *de novo*. ORS 19.125.

Claimant, age 54 at the time of the hearing, was employed as a millwright at the time of his back injuries. He had previously worked as a mechanic, machinist, truck driver and lumberjack. He has an eighth-grade education with some training in welding and diesel mechanics. When he was originally found to be totally disabled in 1975, the referee found that his "ability to sit, stand, walk, bend, lift, drive and sleep has been severely reduced." He could not sit or stand for any extended period without changing position.

At the 1980 hearing, claimant testified that his physical condition is the same as or worse than it was in 1975, that he cannot sit for more than twenty to thirty minutes without changing position and that he cannot stand for more than ten to fifteen minutes without sitting or lying down to obtain relief. He cannot walk more than one block over pavement and has "good and bad days" — usually four or five bad days a week and sometimes continuously for up to twelve days. On bad days, he must lie down from four to six hours during the daytime. His leg buckles three to four times a day, and he sometimes falls. He experiences pain "all the time," but on bad days he is prone to sharp and sudden pain which radiates down his left leg, so that at times he is "afraid to take a step." He gets muscle spasms and cramps three to five times daily. On a bad day he cannot stand for more than ten minutes and cannot lift even a pound comfortably. He wakes up frequently at night because of pain and spasms in the left leg and gets only three to four hours of uninterrupted sleep on a good night. Claimant's wife and sons substantially

corroborated this testimony, and the referee, to whom we normally defer on the issue of credibility, *Condon v. City of Portland,* 52 Or App 1043, 629 P2d 1324, *rev den* 291 Or 662 (1981), found "no evidence to question the claimant's testimony."

Employer's evidence consisted primarily of the report of Dr. Specht and surveillance films. Claimant testified that Dr. Specht examined him for five minutes, after which he concluded that claimant was not totally disabled.[1] Dr. Specht found claimant capable of vocational rehabilitation, with certain "very marketable" skills. He stated that claimant

"* * * [i]s capable of performing work which does not involve excessive frequency of bending and stooping, or lifting over 35 pounds. This may or may not occasion some subjective complaints, but they should not be incapacitating and such activities will not injure his lumbar spine."

He also conjectured that "either hysteria or elaboration" added to claimant's symptoms.

Dr. Specht's opinion was contradicted by the report of Dr. Tsai, who examined claimant after the Board had originally reduced his award. He did not believe that claimant will be able to return to any gainful employment. Dr. Tsai was one of claimant's physicians at the time of his 1971 injury. He examined claimant several times before and after his second laminectomy, which he performed. While Dr. Tsai may not be properly considered claimant's treating physician because of the hiatus in claimant's visits to him, he is in a better position to judge claimant's change for better or worse over a period of time than Dr. Specht, who performed only one examination. Dr. Tsai disagreed with Dr. Specht about the possibility of exaggeration of the injury by claimant and found "no functional interference" during his latest examination.

The referee found that "claimant's testimony was not significantly contradicted by the films * * *." As described by the investigator who took the films, there is

---

[1] Given the detail of Dr. Specht's report, this seems an unusually brief period, but employer put on no evidence to rebut claimant's testimony about the duration of the examination.

nothing in them that demonstrates that claimant's physical condition has significantly improved. The investigator testified that claimant was frequently out of view on the first day of filming and numerous times on the second day. Thus, nothing in the films contradicts claimant's testimony that he must lie or sit down to obtain relief after standing for ten or fifteen minutes. Further, the films fail to rebut claimant's testimony that he has "good and bad days." Claimant may have been able to perform the filmed activities on a good day and still may have suffered total incapacity on a bad day. The f"ms, taken over a period of only two days, do not in themselves rebut claimant's testimony about the degree of his disability on a bad day, because they do not reveal whether he was photographed on a good or bad day. A mere showing that he is able to engage in sporadic physical activity does not sustain employer's burden of proving that claimant is no longer totally disabled.

■  On *de novo* review, we conclude that employer has failed to sustain its burden of proof.

The Board's order is reversed. The referee's order is reinstated.